**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MELISSA EBERT,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **CIVIL NO. 1:13-MC-277** |
| | § | |
| **C.R. BARD, INC., ET AL.,** | § | |
| | § | |
| *Defendant.* | § | |

**BRIEF IN OPPOSITION OF MOTION TO QUASH SUBPOENA**

**ORAL ARGUMENT REQUESTED**

## I.    GENERAL FACTUAL BACKGROUND

Plaintiff has asserted various product liability claims against Defendants C.R. Bard, Inc. and Bard Peripheral Vascular ("Defendants" or "Bard") for a defective and unreasonably dangerous implanted inferior vena cava filter ("IVC filters" or "VCF") after it failed and caused serious injury.

Plaintiff is one of hundreds of cases against Bard around the country.  There is no MDL (Multi District Litigation) in place.  Nonetheless, Plaintiff's counsel reached out to their co-counsel and colleagues representing other Plaintiffs in the Bard IVC filter litigation to coordinate efforts in seeking Dr. Frank Lynch's ("Dr. Lynch") research and studies.  Plaintiffs' counsel decided to effectuate efficiency and issue only one subpoena to lessen the burden on Dr. Lynch. Thus, Dr. Lynch would only have to produce the documents once, and Plaintiffs around the country would benefit.

## II.    Inferior Vena Cava Filters Generally

An IVC filter is a device that is designed to "catch" blood clots that travel from the lower portions of the body to the heart and lungs.  IVC filters may be designed to be implanted, either

permanently or temporarily, in the human body, more specifically, within the inferior vena cava.

The inferior vena cava is a vein that returns blood to the heart from the lower portions of the body.  In certain people, for various reasons, thrombi travel from the vessels in the legs and pelvis, through the vena cava and into the lungs.   Oftentimes, these thrombi develop in the deep leg veins. These thrombi are called "deep vein thrombosis" or "DVT".  Once thrombi reach the lungs, they are considered "pulmonary emboli" or "PE". Certain people are at increased risk for the development of DVT or PE.  In some people who are at high risk for DVT/PE, implanting an IVC filter to prevent thromboembolic events.

### III.   The Recovery and G2 Filters.

The IVC filter at issue in this case is the "G2" filter.  The G2 Filter was manufactured, marketed, and sold by Defendants from September 2005 until sometime around 2010. The Recovery Filter ("Recovery") was manufactured, marketed, and sold by Defendants in late 2002 and subsequently removed from the market in late 2005.

Defendants obtained FDA clearance for their IVC filters through the 510(k) pre-market notification process based upon an already approved predicate device. 21 C.F.R. 807. The predicate device Defendants relied upon for this 510(k) protocol was the Simon Nitinol Filter ("SNF").  Under this pre-market clearance process, the manufacturer must demonstrate that the device is the "substantial equivalent" to and has the same or better safety profile than the device that is currently on the market. The design of the G2 finds its roots in a predecessor device, the Recovery. They look strikingly similar in appearance and have the same design for filtration.  That is, the G2 has six upper struts used for device positioning and filtering, and, six lower struts used for anchoring and filtering- just like the Recovery.

Like the Recovery, the G2 is inserted *via* catheter that is guided by a physician (typically an interventional radiologist) through a blood vessel into the inferior vena cava.  Both filters are designed to be retrieved in a somewhat similar fashion.

Soon after the Recovery's introduction to the market, reports were made that portions of the device were fracturing and migrating to vital organs of the patients in whom it was implanted.  As early as 2003, the Defendants were made aware that the Recovery was flawed and causing injury and death. The Recovery was plagued with manufacturing and design defects which caused the Recovery to experience a significant rate of fracture and migration of the device.  Studies performed in the medical and scientific communities established that the Recovery had a 21% to 31.7% rate of fracture.

Unfortunately, the G2 also shares some of the defects of its ancestor.  The G2 design causes it to be of insufficient integrity and strength to withstand normal placement within the human body.  The global stressors of the respiratory and cardiac cycles of the human body cause the G2 to develop stress or "fatigue" fractures of the Nitinol surface of the device.

In addition to design defects, the G2 suffers from manufacturing defects.  In particular, the G2 is prone to fail at or near the location of draw markings/circumferential grinding markings on the struts of the device.  Put simply, the G2 is not of sufficient strength to withstand normal placement within the human body.

The failure of the Recovery and G2 Filter Systems leads to a number of different and potentially fatal complications.  These complications include: 1) Death, 2) Hemorrhage, 3) Cardiac/Pericardial tamponade, 4) Perforation of tissue, vessels, and organs.

## IV.    PLAINTIFF'S FACTUAL BACKGROUND

Plaintiff, Melissa Ebert, was implanted with Defendants' G2 Filter on January 29, 2008. As time progressed, the filter fractured.  The fractured filter was later removed from Plaintiff's body on March 22, 2011. However, at that point, the fractured strut had migrated slightly upward and endotheliolized along the vena cava wall.  The fractured strut was not removed due to its positioning.  Some four months later, the fractured strut migrated to Plaintiff's pulmonary artery. On October 17, 2011, the fractured strut was miraculously removed from Plaintiff's pulmonary artery.  During the time that the fractured strut was inside of the Plaintiff, she feared not only for her life, but she worried about her two children that would be left without a mother if anything ever happened to her.

## V.   **PROCEDURAL BACKGROUND**

Plaintiff's complaint is currently filed in the Eastern District of Pennsylvania.[1]  It was discovered that Dr. Lynch was involved in research relating to the efficacy of Defendants' IVC Filters and the studying of any complications.  Dr. Lynch communicated directly with employees at Bard.  In fact, one email produced in discovery is the only reason we know that Dr. Lynch was involved early on studying the efficacy and complications of the Recovery.  Recently, Bard produced consulting agreements that shows Dr. Lynch has been involved with Bard from at least 2004-present.

Plaintiff's case against Bard is one of many around the country relating to Bard's IVC filters.  Plaintiff's sent numerous requests for production of documents, and the Defendants produced over two-million pages of documents in response.  The only documents produced

---

[1]Civil Action No. 5:12-cv-01253-LS.

relating in any way to Dr. Lynch's research and studies is the email mentioned above as well as later consulting agreements. No other information is listed on any privilege logs Defendants have provided Plaintiff's counsel. Thus, Plaintiff's counsel issued this subpoena seeking all information related to Dr. Lynch's involvement with the Bard's IVC filters.

The parties have a protective order in place to account for third-party discovery.  (**Exhibit "A"**).  Specifically, paragraphs 17 and 18 cover this precise issue: "A third party producing documents in response to a third party subpoena".  Dr. Lynch's counsel is aware that the parties added these paragraphs to cover all documents produced by Dr. Lynch.

During the extensions of time granted by this Court, Plaintiff's counsel and Dr. Lynch's counsel have conferred on numerous occasions regarding the discovery requests, search terms, Health Insurance Portability and Accountability Act ("HIPAA") compliance, and responsive documents.  Since the parties have reached an impasse, they are seeking the Court's assistance regarding the subpoena for documents.

## VI.    QUESTIONS PRESENTED

### A.    WHETHER PLAINTIFF'S SUBPOENA MUST BE QUASHED AS IT IS OVERLY BROAD AND UNDULY BURDENSOME?

**Suggested Answer: No.**

### B.    WHETHER PLAINTIFF'S SUBPOENA MUST BE QUASHED AS IT SEEKS PATIENT IDENTIFYING INFORMATION AND OTHER INFORMATION PROTECTED BY HIPAA?

**Suggested Answer: No.**

**C.     WHETHER PLAINTIFF'S SUBPOENA MUST BE QUASHED AS IT SEEKS CONFIDENTIAL, PRIVILEGED AND PROPRIETARY INFORMATION WHICH DR. LYNCH IS BOUND NOT TO DISCLOSE?**

**Suggested Answer: No.**

**D.     WHETHER DR. LYNCH IS ENTITLED TO ATTORNEY'S FEES FOR PLAINTIFF'S BREACH OF FEDERAL RULE OF CIVIL PROCEDURE 45?**

**Suggested Answer: No.**

## VII.    ARGUMENT & AUTHORITIES

### A.     Plaintiff's subpoena is not overly broad or unduly burdensome.

As a general foundational principal regarding motions to quash subpoenas, Courts generally prefer modification of a subpoena to the outright quashing of a subpoena. Linder v. NSA, 94 F.3d 693, 698 (D.C. Cir. 1996); Northrop Corp. v. McDonnell Douglas Corp., 243 U.S. App. D.C. 19, 751 F.2d 395, 403-04 (D.C. Cir. 1984). As such, Courts often modify and constrain the scope of subpoenas rather than inflicting the serious, and possibly injurious, result of quashing the subpoena. *See generally* Linder et al v. Adolfo Calero-Portcarrerro et al,180 F.R.D. 168 (D.D.C. 1998).

The burden of proving that a subpoena is oppressive is on the party moving to quash. Westinghouse Electric Corp. v. City of Burlington, Vt., 122 U.S. App. D.C. 65, 351 F.2d 762 (D.C. Cir. 1965). Similarly, the party seeking an order to quash a subpoena has the burden of proving that the subpoena will bring about an undue burden, and the party must prove its burden to the Court with specificity. Gabe Staino Motors, Inc. v. Volkswagen of America, Inc., 2003 U.S. Dist. LEXIS 3194, 5-6 (E.D. Pa. 2003). Citing Flatlow v. The Islamic Republic of Iran, 196 F.R.D. 203, 207 (D.D.C. 2000). The burden is particularly heavy to support a motion to quash as

contrasted to some limited protection.  Horizons Titanium Corp. v. Norton Co., 290 F.2d 421, 425 (1st Cir. 1961).

As the court stated in Linder et al v. Adolfo Calero-Portcarrerro et al, 180 F.R.D. 168 (D.D.C. 1998), the "factors to be considered in the undue burden analysis include relevance, the need of the party for the documents, whether the request is cumulative and duplicative, the time and expense required to comply with the subpoena and the importance of the issues at stake in the litigation."

Simply claiming that a party will be placed under an undue burden without specificity, such as "specific estimates of staff hours needed to comply," shall be "categorically rejected."  Gabe Staino Motors, Inc. v. Volkswagen of America, Inc., 2003 U.S. Dist. LEXIS 3194, 5-6 (E.D. Pa. 2003). Citing Association of Am. Physicians & Surgeons v. Clinton, 837 F. Supp. 454, 458 n. 2 (D.D.C. 1993).

To start off, Dr. Lynch's position is that the subpoena for documents by Plaintiff should be quashed, not modified. He has simply ignored the fact that "Courts generally prefer a modification of a subpoena to an outright quash".  The "heavy" burden to quash a subpoena is on the party seeking to quash the subpoena and that burden must be met with specificity.  Here, Dr. Lynch simply fails to provide any specifics with regard to the subpoena being unduly burdensome or oppressive.

First of all, it is clear that volume alone is not enough.[2]  As stated in <u>In re Radio Corp. Of America</u>, 13 F.R.D. 167, 172 (S.D.N.Y. 1952):

> "There can be no doubt that any witness who is subpoenaed suffers some inconvenience, but the inconvenience 'is part of the price we pay to secure the effective administration of justice and the enforcement of our laws.'"

Along the same lines as the <u>In re Radio Corp</u> case, Dr. Lynch is in the unfortunate position of being an integral possessor of facts involved of a complex products liability case.  With regard to the documents at issue, there are two avenues to obtain Dr. Lynch's documents: 1)  Bard and 2) Dr. Lynch.  Since Plaintiff has already exhaustively and unsuccessfully sought the documents from Bard, the only remaining option Plaintiff has is to obtain the documents from Dr. Lynch himself.

Ultimately, the determination of what constitutes unreasonableness or oppressiveness is a consideration of the totality of the circumstances.[3]  To do this, Courts have used the factors listed above when considering whether the subpoena request is unduly burdensome.[4]  The first factor is relevance, which under the rules of evidence is a broad standard.[5]  Plaintiff is one of hundreds of Plaintiffs around the country that are seeking the Dr. Lynch documents.  What Dr. Lynch knew, when he knew it, and to whom that knowledge was conveyed is critical to Plaintiff's case.  Dr. Lynch is not simply one of thousands of physicians that would contain common information.  He

---

[2]*See* <u>Democratic Nat'l Comm. v. McCord</u>, 356 F. Supp. 1394, 1396 (D.D.C. 1973). *See also*, <u>Northrop,</u>751 F.2d at 403-04.

[3]<u>Northrop</u>, 751 F.2d at 403-04.

[4]<u>Linder</u>, 180 F.R.D. at 174.

[5]F.R.E. 401 - Evidence is relevant if: a) it has any tendency to make a face more or less probable than it would be without the evidence; and b) the fact is of consequence in determining the action.

is a specialist. Dr. Lynch is a highly regarded, well-known interventional radiologist.  He is one of only two interventional radiologists in the country that can remove a filter that has endotheliolized into the caval wall.

The request for this specific information in the subpoena cannot be limited in time because the relevance goes back to day one.  The best Plaintiff can tell, Dr. Lynch's initial research and studies of the Recovery filter was around 2002-2005. However, Plaintiff is unaware if Dr. Lynch was involved any earlier. Plaintiff was recently provided with consulting agreements that show Dr. Lynch was also involved with research and studies of all Bard filters (specifically the G2) from 2005 to the present.

The second factor is the need of the party requesting the documents.  Ultimately, a failure to warn case comes down to what a medical device manufacturer knew or should have known and what it told or neglected to tell the public about its product.  Similarly, a design defect case comes down to evaluating failures of a medical device to determine if there is a common theme relating to a defective design.  Thus, Dr. Lynch's documents would be essential to the Plaintiff proving her case because they would show what Bard knew and when Bard knew it.

The third factor is whether the request is cumulative and duplicative.  This is easily answered by the fact that Plaintiff has not obtained the Dr. Lynch documents from any other source.  This is not a situation where Plaintiff has the documents, but wanted to issue a subpoena to double check them. Dr. Lynch is concerned with providing information that would duplicate documents that Plaintiff has already obtained from Bard. However, it would simply be easier for Dr. Lynch to provide everything he can get his hands on, and let the parties be concerned with duplication.

More importantly, Plaintiff would prefer Dr. Lynch to be using his time to save people's lives. This is why Plaintiff sought to coordinate the efforts of counsel around the country and only make Dr. Lynch search his system once. Plaintiff's counsel does not want Dr. Lynch to have to go through this search for each and every Bard IVC Filter case currently pending throughout the United States.

The fourth factor is the time and expense required to comply with the subpoena.  As the Court in <u>Gabe Staino</u> stated, simply claiming that a party will be placed under an undue burden without specificity shall be "categorically rejected".[6]  Dr. Lynch has not provided the Court with specific estimates of staff hours needed to comply with the Plaintiff's request.  Simply because the Plaintiff asked for 21 items does not mean that Dr. Lynch has material responsive to all 21 requests. In actuality, if he does, it would make it more likely that the material in his possession is relevant as well as important.  Regardless, Plaintiff involved her ESI specialist who stated that it would only take 3-4 hours of time to conduct an adequately sufficient search.[7]   Plaintiff took it a step further and offered Dr. Lynch a list of search terms.  Finally, Plaintiff even offered to have her ESI vendor perform the search of Dr. Lynch's system.

The final factor the Courts look at is the importance of the issues at stake in the litigation.  Again, Dr. Lynch's documents are critical to not only Plaintiff's case, but hundreds of other Plaintiffs around the country involved in the Bard IVC Filter litigation.  Dr. Lynch researched the Bard IVC filters at issue in this case and studied their failures.  Further, Dr. Lynch corresponded with other interventional radiologists around the country about these products.  Dr. Lynch has

---

[6]<u>Gabe Staino</u>, 2003 U.S. Dist. LEXIS 3194, 5-6.

[7]**Exhibit "B"**.

been involved in programs and studies coordinated by the Defendants to study the safety and efficacy of the Bard IVC filters for nearly a decade.

Even though the subpoena is addressed to a non-party, "inconvenience occasioned by compliance with the subpoena is not a sufficient reason to quash."[8]  When you combine the fact that this case along with the others filed around the country is a complex products liability case with large sums of money at stake for all parties involved, the importance of complete and necessary discovery becomes paramount. What Dr. Lynch knew, when he knew it, and who he conveyed it to at Bard is of the utmost importance and directly at issue in Plaintiff's case.

As the Horizons Court so elegantly put it, "the subpoena is of course too broad as issued, but there is nothing unusual about that.  Such a sweeping subpoena means about as much as the asking price for a rug in an Oriental bazaar. It is normally just a means of opening discussion between discoverer and discoveree. The discoverer asks for too much because he is not, until he is told, aware of the discoveree's problems."[9] In order to complete the puzzle of what Dr. Lynch knew, when he knew it, and who he conveyed if to, a broad request is the only appropriate starting point.  The broad subpoena issued by Plaintiff was simply a matter of trying to open the discussion with Dr. Lynch.

Alternatively, Courts have considered the idea of reimbursing a non-party witness' expenses incurred in producing documents in response to a subpoena.  However, "the courts have not required reimbursement unless the costs are great or the document demand is unreasonably

---

[8] Pathe Laboratories, Inc., v. Du Pont Film Mfg. Corp., 3 F.R.D. 11 (S.D.N.Y. 1943).

[9] Horizons, 740 F.2d at 560.

broad."[10]   As in the <u>Columbia Broadcasting</u> as well as the <u>Arthur Young & Co.</u>[11] cases, the Court reimbursed $2.3 million and $100,000 in claimed "out-of-pocket" costs, respectively.  Dr. Lynch has failed to give any indication of how much time, effort, or cost that Dr. Lynch would have to make to get the information requested.

### B.  Plaintiff's is not seeking patient identifying information and other information protected by HIPAA.

Plaintiff is not asking Dr. Lynch to violate HIPAA. Proper procedural mechanisms have been created to comply with these HIPAA requirements, including but not limited to protective orders, redactions, and authorizations.  All of which have been used in this case in preparation for a production of documents by Dr. Lynch.  First, Plaintiff has prepared a list of all Plaintiffs (clients of Plaintiff's co-counsel and colleagues) around the country that have been treated by Dr. Lynch when their Bard IVC Filter fractured and obtained a signed HIPAA authorization for each of them.[12] Plaintiff's ESI vendor has identified proper parameters that can be set in order to filter out all HIPAA protected information. Further, any redactions necessary after the proper search terms and filters have been set in place could be performed by Dr. Lynch's counsel, which is a normal, everyday responsibility of attorneys in the discovery process.  Additionally, 45 C.F.R. 1640512(e) permits disclosure pursuant to a subpoena if there is a confidentiality order in place.[13]

---

[10]*See*, <u>United States v. Columbia Broadcasting System, Inc.</u>, 666 F.2d 364 (9th Cir.), *cert. denied*, 457 U.S. 1118, 102 S. Ct. 2929, 73 L. Ed. 2d 1329 (1982).

[11]<u>SEC v. Arthur Young & Co.</u>, 190 U.S. App. D.C. 37, 584 F.2d 1018 (D.C. Cir.), *cert. denied,* 439 U.S. at 1017 (1978).

[12] These signed HIPAA authorizations allow Dr. Lynch to produce un-redacted medical records and other related documents for those specific patients.

[13]**Exhibit "A"**.

Therefore, all of Dr. Lynch's concerns can be addressed and are not an issue with regard to complying with HIPAA.

**C.  It is irrelevant if Dr. Lynch did not personally treat the Plaintiff as long as he possesses information that is relevant to this litigation.**

Dr. Lynch is correct. He did not personally treat Plaintiff Melissa Ebert.  However, Dr. Lynch did treat numerous other Plaintiffs around the country that are directly affected by the research and studies that Dr. Lynch conducted regarding the Defendants' filters.  Furthermore, the fact that Dr. Lynch did not personally treat Plaintiff or review her medical records is not grounds for quashing the subpoena:

> The "mere fact that [the witness] had no personal knowledge concerning plaintiff's accident [did] not mean that he [did] not have information which would aid plaintiffs in discovery."

Composition Roofers Union Local 30 Welfare Trust Fund v. Graveley Roofing Enters., 160 F.R.D. 70, 72 (E.D. Pa. 1995) (citation omitted).  Any contention that Dr. Lynch has no personal knowledge is irrelevant.  Simply put, it is enough to show that he possesses needed documents. Dr. Lynch is not denying that he created and possessed responsive and relevant documents. Equally, he is not claiming that he does not have the responsive and relevant documents.

For example, in the Composition Roofers[14] case, a secretary claimed that she did not have personal knowledge of the transactions in question, and, as such, complying with the subpoena would be an undue burden.  The Court did not buy that argument. Instead, the Court found that it was enough to show that she, as secretary, had possession of records concerning the transactions that were at issue in the litigation.

---

[14]*See generally,* Composition Roofers, 160 F.R.D. 70.

Here, as in the <u>Composition Roofers</u>[15] case, Plaintiff (as well as Plaintiff's co-counsel and colleagues around the country) have repeatedly tried to obtain these records from Defendants for several years without any success. In fact, Plaintiffs have combed through millions of pages of documents for any and all information related to Dr. Lynch's research and studies. However, only a few emails have been found as well as some recently produced consulting agreements illustrating Dr. Lynch's involvement with all of Bard's IVC Filters since 2005. Dr. Lynch's presumption that his documents have been produced by Bard is unsupported and clearly speculation. If Bard had the documents, then Dr. Lynch's counsel would have been notified and this entire ordeal would have been done.  Thus, Plaintiff knows the information exists and Dr. Lynch created it.  Yet, Plaintiff's only remaining avenue to obtain this information is from Dr. Lynch.

**D.      The parties have already entered into an agreement to protect the confidentiality of Bard's proprietary materials.**

Proper precautions have already been taken in this matter so as not to disclose confidential information.  However, jurisprudence shows us that it is the party moving to quash who has the burden to prove that will bring about an injury to the movant or to another party. <u>Composition Roofers,</u> 160 F.R.D. at 72. Additionally, the movant cannot merely claim that the information is confidential and will bring about a harm.  The movant must "establish with specificity 'that disclosure will work a clearly defined and serious injury to the moving party.'" <u>Gabe Staino Motors, Inc. v. Volkswagen of America, Inc.</u>, 2003 U.S. Dist. LEXIS 3194, 5-6 (E.D. Pa. 2003). Citing <u>Composition Roofers,</u> 160 F.R.D. at 72.

---

[15] <u>Id.</u>

Confidentiality is not an insurmountable issue. It is a familiar problem in discovery of cases of this sort and measures to preserve it are easily contrived. As illustrated above, Plaintiff's counsel reached out to Defendants when the subpoena was issued regarding this issue of documents obtained from a third-party subpoena.  The parties conferred on the matter and agreed to amend the protective order entered into on this case.[16]  Simply put, Dr. Lynch is raising an argument that Plaintiff has already addressed with Defendants. As stated in <u>Pansy v. Borough of Stroudsburg</u>, 23 F.3d 772, 786 (3d Cir. 1994), broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing.[17]  Dr. Lynch has failed to illustrate with specificity any specific harm in complying with Plaintiff's subpoena.

### E.    Dr. Lynch is not entitled to attorney's fees.

"There is no authority in the federal rules for reimbursing a third party witness for his attorneys' fees." <u>Phillips Petroleum Co. v. Pickens,</u> 105 F.R.D. 545, 550 (N.D. Tex. 1985). Federal Rule of Civil Procedure 45(d)(1) provides:

> "A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction - which may include lost earnings and reasonable attorney's fees - on a party or attorney who fails to comply."

F.R.C.P. 45(d)(1).

As mentioned above, Plaintiff's counsel took the following steps to avoid imposing an undue burden or expense on Dr. Lynch:

---

[16]**Exhibit "A"**.

[17]*See also*, <u>United States v. Wecht</u>, 484 F.3d 194, 211 (3d Cir. 2007) (With an umbrella protective order, the burden of justifying the confidentiality of each and every document rests with the designating party).

1)    Plaintiff subpoenaed Dr. Lynch for any documents he has in his possession, custody, and control.[18]

2)    Plaintiff agreed to drop the deposition request of Dr. Lynch.[19]

3)    Plaintiff's counsel conferred with Dr. Lynch's counsel numerous times regarding the requests for documents and ways to make it easier on Dr. Lynch.

4)    Plaintiff offered Dr. Lynch's counsel with search terms to allow for a quick and efficient search of his hard drive.

5)    Plaintiff's counsel prepared a list of all clients that Dr. Lynch treated and obtained a signed HIPAA authorizations for each of them.

6)    Plaintiff's counsel notified Defendants of this subpoena for documents from Dr. Lynch. This resulted in an amended protective order regarding this precise issue.[20]

7)    Plaintiff's counsel set up a phone call with Plaintiff's ESI vendor, which stated that it would only take 3-4 hours to complete a search (with the proper filters, search terms, and HIPAA redactions) that would provide Plaintiffs with all responsive documents Dr. Lynch would have.

8)    Plaintiff has subpoenaed Hershey Medical Center requesting the same documents because Dr. Lynch performed much of his work on Hershey's system.[21]

9)    Plaintiff's counsel offered for his ESI vendor to conduct the 3-4 hour search for Dr. Lynch.

With regard to Dr. Lynch's request for attorneys fees, Plaintiff has cooperated with Dr.

Lynch for eight months, given timely extensions, unsuccessfully sought the information first

from all other sources, withdrawn the deposition, prepared search terms, and offered ESI

assistance. Plaintiff does not feel Dr. Lynch has made a record that Plaintiff failed to take

---

[18]**Exhibit "A"**.

[19]**Exhibit "B"**.

[20]**Exhibit "A"**.

[21]Plaintiff has attempted to resolve this issue with Hershey for months to no avail. Initially, Hershey gave Dr. Lynch the green light to produce the information on their system. However, it was later discovered that Dr. Lynch did not follow proper protocol through the University and conducted his private business matters on the Hospital's system. Unfortunately, pursuant to the local rules, Plaintiff must file a miscellaneous action in order to allow for Hershey to comply with the Subpoena. It would assist Plaintiff to have a favorable court order in the instant action to present to Hershey and/or the judge that gets assigned the case.

reasonable steps.  Again, the standard is one of reasonableness.  If anything, Plaintiff has

exhausted any and all steps possible to accommodate Dr. Lynch.  Further, Dr. Lynch has not

made a record showing that the subpoena was for harassment.  In fact, Plaintiff has shown it is

quite the opposite.

Rather, Plaintiff feels that Dr. Lynch is seeking reimbursement for fighting responsive

discovery as opposed to costs related to complying with the subpoena. As illustrated in the

Phillips case, there is no place in the Federal Rules for this kind of an award.  If Dr. Lynch is

seeking attorneys' fees for a failure of Plaintiff's counsel to take reasonable steps, Plaintiff has

demonstrated all steps and efforts it took to be more than accommodating to Dr. Lynch regarding

this request for a simple 3-4 hour search that affects hundreds of similarly situated Plaintiffs all

around the country.

In fact, Plaintiff has taken the steps necessary to prevent Dr. Lynch from doing this search

for each and every Plaintiff.  Plaintiff's counsel issued this subpoena for the very reason that Dr.

Lynch's time and efforts are best spent saving lives. Instead of subpoenaing Dr. Lynch in

hundreds of cases or obtaining letters of rogatory from each and every court, Plaintiff organized

one concerted effort to obtain documents from Dr. Lynch, which is the subpoena at issue.

## VIII.  RELIEF REQUESTED

For the foregoing reasons, Plaintiff requests that this Court deny Dr. Lynch's Motion to

Quash Subpoena; or, in the alternative, modify Plaintiff's subpoena.

Respectfully Submitted,

**For the Plaintiff, Melissa Ebert**

Dated: **February 14th, 2014**          */s/ Russell T. Button*
                                        Russell Button
                                        ***Admitted Pro Hac Vice***
                                        Law Office of Ben C. Martin
                                        3219 McKinney Avenue, Suite 100
                                        Dallas, TX 75204
                                        Phone: 214-761-6614
                                        Fax: 214-744-7590
                                        Email: rbutton@bencmartin.com

## Certificate

I hereby certify, subject to Fed. R. Civ. P. 11, that this brief complies with the word-count limited described in LR 7.8(b)(2) and contains 4, 952 words.

*/s/ Russell T. Button*
Russell T. Button

## Certificate of Service

I hereby certify that all counsel of record have been served with an electronic copy of this document together with the proposed order on this February 14th, 2014.

*/s/ Russell T. Button*
Russell T. Button